2013-2002. Robert Cook of Milbank Tweed and Hadley McCloy for Plaintiffs. The 401 patent relates to transgenic plants that are resistant to a commonly used herbicide known as 2,4-D. The central issue today is that the district court erroneously construed the claim term of biological activity of 2,4-D monooxygenase instead of using the definition found directly in the specification, namely cleaving the side chain of 2,4-D. Instead of using that, the district court adopted Dow's proposal by relying solely on extrinsic evidence and specifically listed in page 815 of the record in her opinion that she was relying on expert opinions, dictionary definitions, and what the court perceived as an error but what in fact was merely a further characterization of a completely irrelevant enzymatic activity that was discovered after the filing of the patent application. Let me see if I understand the breadth of claim one of your patent. Are you claiming coverage of all genes that code for any enzyme that cleaves the side chain of 2,4-D? We're claiming, in the context of the specification, we're talking about soil bacteria. Help me out here. I think my question was intended to include not just soil bacteria but any gene that codes for an enzyme that cleaves 2,4-D. So, is the answer yes, you are claiming any such enzyme or that it is more limited? Well, in the context of the specification, it is somewhat limited by the specification. If I come up with a gene that does not come from soil bacteria but it has that function, do I infringe? You would if it followed the other tenets of the specification. In other words, if you found it by the growth test, for example, that's set forth in the application, which should find every gene that does that. It is not inconceivable, your hypothetical is not inconceivable, but there might be some completely different mechanism that isn't disclosed here in the specification at all. If that were the case, then I would submit that that would be another whole invention and probably scientifically astounding. But, it is conceivable. So, the context is, what the inventors did here is they recognized that it was well known in the prior art that the degradation of 2,4-D followed a degradation pathway that had six steps in it. At the time of this invention, five of the enzymes that produced five of those six steps were well known, well characterized, sequenced, and cloned. The only one that wasn't was the first step. Was the enzyme at the first step well known, well characterized? Yes, the enzyme was. In column one of the specification are listed several articles that identify the enzyme as 2,4-D monooxygenase. That's what it was called for short, but also state that the function, the biological activity of that enzyme was cleaving the side chain. So, it was known absolutely at that time that the side chain, that the first step in the degradation of 2,4-D was an enzymatic induced step of cleaving the side chain, of changing that 2,4-Dichlorophenoxyacetate to 2,4-Dichlorophenol. That was known. That's identified in the prior art. Just as I understand, just as a technical matter, the enzyme doesn't itself do the cleaving. It does something to the molecule so that after it does that to the molecule, it naturally cleaves. I'm thinking there are two colorful pictures. It's not cleaved when it crosses that goblin in the middle. The cleaving takes place at the next step. It's a hydroxylase reaction where the oxygen goes to... Let me just tell you what I'm thinking about this. It seems to me that your case depends on two steps. One is to treat the expression 2,4-D monoxygenase as a name rather than a description. And then second, in addition, to say that the thing, the enzyme that that names, has by definition in the patent one pertinent biological activity. My impression as to the first, I guess I have difficulty at both steps, is that the patent itself, even more the prosecution history and your original claims back from 1989, go back and forth, as does your brief actually, between using 2,4-D monoxygenase as a name that is without an indefinite or definite article in front of it and sometimes using it with an indefinite article. Where there's an indefinite article, it sounds a lot like a description, which would mean that the natural meaning of the biological activity of that descriptor is the activity that that phrase describes, which has something to do with where the second oxygen atom goes. And then the biological activity, there are two uses, I think you say, in column two. One of which, the first of which, doesn't exactly read like a definition. It says it does this thing. And then the second one, right at the bottom of the column, uses EG rather than IE, suggesting there are a bunch of different biological activities. Tell me where I've gone wrong. I know there's a lot in that, but it seems to me that's the logic of your argument. You said a lot, but the critical thing that is wrong with some of the premise that you're basing the question on is that the main point is where the second oxygen goes is completely irrelevant. It isn't a factor at all. And the reason for that is because the word 2,4-D monooxygenase was a term of art at the time of the invention, well recognized by everybody. That was the only thing it was known as, as a shorthand. You could have said, cleaving the side chain, if you wanted to describe what was happening in step A, but instead they said everybody thought it was a monooxygenase because what they knew was one of the oxygens created that cleavage, caused that cleavage. The second oxygen was irrelevant. It didn't matter what it did, and to this day it doesn't matter what it does as far as that part of the discovery or determination of whether you can get a gene that expresses that kind of an enzyme. So the first step is to recognize that every time 2,4-D monooxygenase is used, it's used as a term of art always together. You will not find the term monooxygenase by itself anywhere in the specification. I thought the testimony was undisputed, expert testimony, explaining to the rest of us what usage is in the art, that the 2,4-D monooxygenase is just, the 2,4-D says, here's the compound or the chemical on which this monooxygenase is doing its work. And nobody had any, and it was also, I thought, undisputed, that everybody agreed that to say something is a monooxygenase says something about what it does that includes what happens to the second oxygenase. Well, the expert testimony that you're referring to is questions asking about definitions monooxygenase or definitions dioxygenase. And my main point is that you can't dissect the words of the claim term that way. The claim term is biological activity of 2,4-D monooxygenase. It's the whole term. It has components of it of biological activity in the 2,4-D monooxygenase, but 2,4-D monooxygenase is never used without 2,4-D, anywhere other in the specification other than that term of art, 2,4-D monooxygenase, which meant to everybody in the world this activity of cleaving the side chain. It didn't, and it did it by, one oxygen did the cleaving, the other oxygen wasn't, it wasn't known what happened to that. And, in fact, when it was discovered seven years later that the second oxygen goes actually to a different substrate, then some people started saying, well, it's then, therefore, a dioxygenase, but it's not really a dioxygenase. But at that point, you know that the terminology is at least misleading, maybe just an outright misnomer, and you don't change the claim. It's not misleading. It is not at all misleading because it's no more misleading than calling a married woman by her maiden name. In other words, the name changed. The name changed. I was only going to use that if I had three women on the panel. But that's the point is that if this is what it was known as, they couldn't possibly have called it dioxygenase in 1986 at the time of the invention because nobody knew that that's what happened. This was a later discovery. The other one is our example of Pluto. The planet Pluto was called the planet Pluto in 1986. Today, you wouldn't call it that. It's not wrong to call it the planet Pluto, especially if somebody knows what you're talking about. That example uses a term, planet, that is intended to be a descriptor. What happened, I gather, is that scientists decided that the definition of that descriptor needed to be tweaked. It seems to me you have a real difficulty if you think of 2,4-D monoxygenase as a descriptor as opposed to simply the name of a particular chemical, a particular enzyme that was identified even before the gene was identified that expressed it. To answer that, I would direct your attention to the intrinsic evidence in the specification of the articles that are cited that actually talk about cleaving the side chain, identifying it as 2,4-D monoxygenase as the short term for that activity. Why were the original claims in 1989, a whole series I think starting with one, sort of the first half of the claims, they actually do use an indefinite article in front of the expression 2,4-D monoxygenase. They say, A, 2,4-D monoxygenase. What could that usage be doing except using the term as a description of something that does to 2,4-D what monoxygenase does? The application, as you may have observed, was filed. The priority application was filed in Germany in 1986 and then it was filed a year later as a PCT application and then it entered the national stage in the United States as a CIP. There was disclosure added and the disclosure added was really from the context of saying that these inventors knew they didn't want to limit their case to one gene because the way they discovered the gene was using this growth test that would be useful to discover any gene that creates that function. It was the function they were after because they were after identifying what causes, what is the enzyme that we can use to put into plants that would cause that degradation first step. The degradation first step was identified as TFDA, standing for 2,4-D step A. It's as simple as that. That's the activity they were looking for and the gene they were looking for. Recognizing it was not one gene but there were many genes and they knew that because there were many types of soil bacteria that did degrade 2,4-D. It was known in 1986 that there were, as identified again in column one of the patent, there were five different types of bacteria identified there, all of which had ability to degrade 2,4-D. They wanted to make sure they had the coverage for any of the enzymes that create that enzyme, that produce that enzyme. Go ahead. I lost my train of thought. I'm sorry. It sounds like you're almost done. The testimony on this point from Dr. Madsen, and you cited it at page 25 of your reply brief, I think, is that the screening procedure can identify nearly every gene in the related TFDA family. What is your concept and the concept in the patent of the TFDA family? How broad is that family? It's not very broad. The reason I say that is basically, and this goes to the written description part of the case, which I do want to address quickly, but the family, the growth test is very easily understood. It's a cookbook example in the case, in the application. It may not be clear to the layman, but it's a cookbook example, very detailed. Anyone of ordinary skill in the art can follow it. What they did is they, the very clever growth test that they did is they created first this negative mutant that didn't have the activity, and they deposited the mutant bacteria in a depository so that anyone could grab that. That was the real hard part. That was the laborious part of identifying, of getting to the actual gene that would express the protein. After you have that deposit, then what you do is you take your bacteria and you break up the DNA into many, many pieces and then see which ones, when it's reconnected to the mutant bacteria, then which grows. It's a very simple test. That's right, but you see, both in response to my earlier question and now when I ask about what is the scope of this collection of genes, you turn to the asset. It's as if this patent is a patent on the asset. I want to know whether you're defining TFDA and the TFDA family as a matter of structure, as a matter of function, or as a matter of source, some combination of those three. It's important to me to know exactly what the parameters of the TFDA gene are, so you use it in this patent. It is a claim that defines a function, the function of cleaving the side chain of 2,4-D. But you say it's not that broad. That function, and okay, we don't have a well-defined structure. We do have one gene, one at Figure 10, the sequence, which is Claim 4, which by any means, that is supported by the specification. So the lower court's statement that we can't win at all doesn't go to Claim 4. But it also, the growth test is so well-defined, the soil bacteria are so closely related and very similarly developed, environmentally developed through, and this is known by those of ordinary skill in the area to whom this patent is directed, that as some of the testimony later on, when it was represented by Dow during the Markman hearing, that there could be some other bacteria that's not soil bacteria. And the expert's answer was that would be dumb to use human liver bacteria as a source, or dumb to use an anaerobic sludge as a source. The patent is directed to soil bacteria. That's what was known to degrade 2,4-D. So it is limited to that group by way of the growth test. In other words, it is a functional claim, but there's enough disclosure there of a small enough group, and the testimony is very clear, there aren't many enzymes, it's not like billions of enzymes. That testimony was misquoted, where Judge Bum said that Beyer's own expert said it was billions and billions. That was not what he said. He said just above the part that she quoted, he said it was perhaps dozens. Can I ask about one piece of the claim that I guess I don't quite understand the role it's playing, the expressible implants? On the evidence both ways, on the written description question about how much else besides the TFDA might be out there that the broader claim covers, is any of that evidence, or maybe you could just tell me, is there any reason to think that soil bacteria, relevant sequences that perform the cleaving function, are more readily expressible implants than human liver bacteria sequences? Does anybody say that something from your point of view, like, don't worry about all this other stuff that Al was talking about, because that just couldn't be expressible implants. So that's a red herring. That is accurate in the sense that the invention at the time, the one thing that had to be proven was that not only can you get the gene that expresses the protein, but can you put that in a plant cell, and will it work in the plant cell and make the plant cell resistant to the herbicide, or will it just kill the plant? This was one of the first times that an exogenous gene was ever put into a plant. So to your question, Judge Toronto, you wouldn't go to human liver, or you wouldn't go to salmon sperm, or you wouldn't go to some other DNA to put in, because first of all you wouldn't know if it would work, and why would you go with something that doesn't have any relation to the plant? 2,4-D was known to degrade in soil. It was used as a herbicide. It was approved by the Environmental Protection Agency as usable because it didn't have a long-lasting effect and stay toxic in the biological chain. It degraded. So that's where you go to the soil bacteria. So it's quite correct to say you wouldn't go. The other examples are absurd. As I said, the expert when he was asked about that, he said, You wouldn't go there because of a low likelihood of successfully identifying a bacterium that would work, or you wouldn't go there because that bacterium would not be expressible in a plant. You wouldn't know either one, so either one. But it could be expressible in a plant. It's possible with the right promoters, but it would certainly require more invention. And that's the point. Okay. We'll restore three minutes of rebuttal, which puts us about ten minutes over the time we otherwise have. So why don't we add ten minutes to Mr. Dadey's time, only if you need it. May it please the Court. There are three independent reasons why Bayer's patent suit fails. First, as the District Court's detailed opinion emphasizes, all the claims in Bayer's patent refer to the biological activity of 2,4-D monooxygenase. By design, however, Dow seeds use a very different type of enzyme. Second, the invention— Well, why don't you go through your— No, I'm here for you, Your Honor. Go ahead. I think we— You get the basic. I have three points. I do want to make sure I get to all three, but other than that, yeah. All right. Dow's enzyme, or Dow's gene, codes for the enzyme. What— Where— I understand that it only has, in one case, 28 percent, in the other case, I think, 35 percent. 31. 31 percent equivalence to the TFDA gene. Number one, where does Dow get the underlying bacterium? And number two, what— Do you— Does Dow use the same growth test assay? We definitely do not use the same growth test assay. Okay. That's what— What is the nature— What is the source of the bacterium that Dow uses, assuming it's public knowledge? It is public knowledge. It's in the patent. And we definitely— You know, we start with TFDA. That's in the patent. But then we studied it, and there are some that are close, very similar to TFDA, and some that are very different. And as you notice, the numbers, we went on and found the more effective ones for what we— Ours is where they— You know, they're different. But these were— Where I'm going with this is to try to— We've had characterization of the TD— Yeah. You asked the question about that. TFDA family. And I'm trying to figure out whether it would be reasonable to say that Dow's, under Dr. Madsen's construction, whether Dow's enzyme gene is in the TFDA family. Yeah. That word, TFDA family, is not in the patent. Well, I understand. Right. But we're facing claim one, which by its terms is very broad, unless you read monooxygenase very narrowly. But if you agree with Bayer that monooxygenase has to be read more generically and not to be limited to what we now understand a monooxygenase to be, then that claim becomes very broad. And what I understood your opposing counsel to be arguing, in effect, is, well, the claim isn't really as broad as the language would suggest because it's really directed to soil bacteria in which the gene can be detected by the assay, the growth assay. Now, does Dow's product fall within that characterization? Dow's product is not a TFDA gene, Your Honor. And that's not me saying it. That's both the district court noting it, and my colleague on the other side noting it. That is not disputed. And at A8 and at A11, Bayer does not dispute that Dow's product is a lysogene other than the TFDA gene. OK. Now, to go out one more circle of generality, is it among those soil bacteria that it's derived from those soil bacteria that are identified in the patent, five of them, I think? Well, what the patent is about, Your Honor, is about the gene TFDA or a gene almost identical to TFDA. That's not what we have. So I don't know. I understand. But their claim is that, no, we're not limited just to the TFDA. We include some category of genes that have the same function because that's where the language is, encoding a polypeptide, having the biological activity. Now, let's assume that having the biological activity means producing the particular oxygenase that has this cleavage effect. If that's true, do you fall within the categories of soil bacteria that are identified in the patent? I'm sorry. I'm having trouble, Your Honor, because the argument you're advancing is not the construction that the district court was considering. I understand. Okay. Okay. Just to be clear. I'm looking for, the district court basically said all or nothing, and it said nothing. Well, no. No. It said that it considered Bayer's proposed claim construction as an A25, and their proposed claim construction is the one Your Honor started this session asking about. It's everything. That's very clear. It's every single thing that cleaves the side chain. It's not just soil. Well, they backed away from that this morning. Well, you know, okay. But that's, I mean... So I'm trying to see if, given their back-to-away position, do you infringe? We do not infringe because we do not have the TFDA gene, Your Honor. We do not have the TFDA sequence as set out in Figure 10. That's what this patent is about. And they have conceded that we don't have that gene. So, you know, and there is some wiggle room. There's this almost identical. There's essentially similar. But that's conceded. We do not have that. That's the whole purpose of this system. And they come to the patent office. They say, we have the TFDA gene. We study it. We do something different. And now, to suit purposes, they've come up with an extremely broad phrase. But I don't want us to forget about this first claim construction. The TFDA is definitely an important part of their understanding. But I think, as you know, if you go to Claim 1, you actually don't see the word TFDA. What you see is the word monooxygenase. And that word had a settled understanding for more than 50 years. It meant a certain colorful pictures of what that meant. And that's what they told. They put this scientific theory about the way the 2,4-D oxygenase worked. And they called it a 2,4-D monooxygenase. My sense from certainly part of the specification and maybe all but at least some of the prior art cited there that's included is that it was not an uncommon usage to use the phrase 2,4-D monooxygenase without any article indefinite or otherwise in front of it as the name of this enzyme. Thereby not particularly conveying that it was the name of a category defined by operation, by function. Except for the enzymatic. Thank you, Your Honor. I can see why you would get that from the papers. But actually, if you look at the evidence, and I'll walk us through it, that is actually not true. There's one article, the Don article, that uses the phrase 2,4-D. And that gets picked up by one article, the Perkins. But if you go to the patent at 850, it lists... The patent? Column 1, sorry. Column 1 of the 401 patent. If you see all the articles that are listed here, you have Evan, Bollag, all of those. I think 10 of them. Nine of them don't use the word monooxygenase. What they do is they talk about cleaving the side chain. That makes sense, because that's what they were studying. They're agnostic. They don't use it. TG does use it, but he's unsure. He says it may be a monooxygenase, it may not. He's just not sure. So that's one response, Your Honor. But the other, the one I actually like even better, is if you pull up Streber's dissertation, and that's at 13-592 of the Joint Appendix. And this is what I just find absolutely remarkable. He says, okay, he's doing tests. What page are you on? 13-592 of the Joint Appendix. 592. He's doing tests, and he points out there's a monooxygenase that people have studied, and it comes up with this NADH consumption, which makes sense, because as we know from the papers, monooxygenase, it works with having the NADH. And then the next sentence, I'm at the top, just before the number five. He tries it. He says, an analogous method in purification of the 2,4-D monooxygenase currently has not shown any effect. So he's testing it. He knows exactly what the monooxygenase enzymatic mechanism looks like. It should come up with NADH. It doesn't, and his site for that is his own studies. And this is not some individual we found. Dr. Streber is the inventor on the patent, who wrote the word monooxygenase into the claim, and here's his dissertation saying his own studies have shown that it's not working like a monooxygenase should. So I don't think it's correct to say there was a consensus, but it's certainly true that this inventor knew that it was far from clear. And nothing required him to write monooxygenase into the claim. He could have wrote cleaving the side chain. He could have wrote monodye. He could have wrote hydroxylase, as our expert suggested. He could have wrote TFD, which is probably what he should have written. There's a whole set of things he could have written. But why we should have a system where you put monooxygenase knowing this, and they enforce it, I mean, I don't think we should. What do you think claim 4 reads on? Claim 4 is the TFD gene that we don't have here, Your Honor. It's the sequence interferotension. But you do think that it does read on TFD, even though it's a dependent claim, ultimately dependent from claim 1? Well, yes. They wrote a poor patent claim. Is it yes or no? It's a dependent claim. It's a dependent claim. It doesn't have to be, in your view, a monooxygenase, which TFD is not. So in your view of claim 1, claim 4, can't read even on TFD, right? Notwithstanding that figure 10 has the exact gene sequence of TFD. If there's inconsistency here, it's not anyone's fault, except the way they wrote the claims. Claim 4 is about figure 10. Figure 10, everybody agrees, is TFD. We don't have it. So claim 4 reads on TFD, notwithstanding the characterization in the independent claim on which claim 4 depends of TFD as a monooxygenase, right? Well, that is right as far as you go, Your Honor. But monooxygenase, yes. Well, yes, right, fine. That's fine. People write poor claims all the time. It doesn't change the meaning of what they wrote, when they wrote. But you posit two alternative ways to construe the claim. One is limited to just the TDFD, and the other is limited to just the definition that the district court adopted with respect to monooxygenase. I'm wondering why we can't reconcile all of this conflict we have here, particularly with regard to claim 4, by defining what's in claim 1 to be what the district court said and the TDFD gene, or an enzyme coded for the TDFD. And the argument would be, at the time the patent was drafted, people mistakenly thought that particular gene was monooxygenase, that that was part of that. I guess you disavow that. You say you've got to do one or the other. Why can't you have a construction that includes both, but is limited to just those two, then? If you did that, the district court would be affirmed, because as I've said several times, we don't have the TDFD gene. So it would be a clear non-inferiority. No, but I wasn't asking in terms of what consequences you happen to like or not like. I was asking in terms of doctrinally. Doctrinally? Okay, well, let's discuss that. I appreciate that, and I just wanted to be clear about the consequences, because they do matter. Doctrinally, they have written to me, and we said in our brief, you can't do both, which is sort of, it would be incoherent to write both. I agree with you. Doctrinally to me, if somebody writes an inconsistent sentence, you should call them on it and say that's an inconsistent sentence. I'm not sure it's worth torturing doctrines or coming up with claims. Well, I don't know. Let's assume we have a claim for vegetables, and everybody at the time thinks a tomato is a vegetable. So you've got a dependent claim, and it says the vegetable here is a tomato. And then later we find out that no, tomatoes are fruit. You could still construe claim one of vegetables, all vegetables plus the tomato. No? You could. That's not this case for several reasons. As we were just talking about, the assumption was not that. The assumption was not that everything was a vegetable. I just went through that. The assumption here is not that this is just a name change from Pluto or spousal relations. It's not. It's a fundamental change in understanding. But even if you get all that, sure, you could do that, but why would you stretch to do that? Let's not forget, they knew. 1993, Dr. Hausinger, their expert, discovered this was a diastasis, announced it. The patent issued seven years later. Did they bother to tell anything? They go to the patent office to correct it, a little minor typo, but they don't come and say, hey, you're about to issue a claim with an invalid and misleading sentence in it.  So to the extent there are doctrines that would allow the court to massage the language to get to a sound result, this does not seem to me like this type of case. Let's assume the monooxygenase issue out of the case for a moment and in effect move to the written description that you've briefed. I asked your opposing counsel if Claim 1 really read on any gene that coded for an enzyme that has the function of cleaving 2,4-D. I take it you're... Well, I've left off the second limitation, but that's... You heard his answer. Could you respond to Beyer's position with respect... His answer essentially was no, it isn't that broad. Your position, I take it, is that yes, it is. Yes, that was their position as well. Could you engage with his argument as to why that claim can and should be read more narrowly than simply as a functional claim starting with a gene that codes for an enzyme that performs this function no matter what? Is that the construction you want me to discuss? Yes. Well, that construction is a broad construction. You bet. You bet, exactly. It would reach not just soil bacteria. It would reach any enzyme, any source. Whatever and everything. Yes. And your opposing counsel in his colloquy with me explained why, in his view, that claim isn't that broad and therefore does not create the problems that would be inherent in a claim of that breadth. Now I want you to respond to what he had to say on that. So a narrower version of the claim. Right. Right, which is hard to get to. But sure. If you're going to claim a DNA sequence, the law of this court is quite clear that you actually have to either give the sequence or really teach the public really darn close to that sequence. It's not enough to just give one sequence and then say I get all the other enzymes that do the same thing. We have the Carnegie-Mellon case you're familiar with. The point there is you have to describe the sequence. A test or a plan to go find the thing isn't enough. And that's all the growth test does. They give the sequence, the TFDA sequence, sure, and they give a simple growth test that lets you find countless enzymes. And we can quibble about the numbers, and I can give you some quotes. Diversity and abundance of TFDA-like genes, death at age 12, 7, 92. Possibly hundreds of enzymes. Some is yet undiscovered. There's clearly many enzymes out there that are not soil that they would reach. And even if you just limited it to soil, their expert says it would only find half the soil. But even if you limited it to half the soil... You mean the growth test would only find half the... Yeah. Why is that, by the way? I read that testimony, and I was bewildered by why that was so. I had the same question, Your Honor, and I'm not sure I got enlightened by it, but it's certainly what the record says. Their expert said. I think it has to do with the actual expression and whether they get their promoters right or something. I don't know why you wouldn't get half. But it doesn't matter. Is it saying that the test would not find successful? I think it's that it wouldn't actually work, ultimately, is the idea. But I was puzzled by the same thing, Your Honor, but it doesn't matter because they're getting way more than the one enzyme. Even if they just get half the soil or all the soil, they are getting far more than the sequence they have taught the public. And the whole purpose of the written description doctrine is if you are going to get a patent on a sequence, then you have to have taught the public either that sequence or the part of the sequence that really matters or some sort of representative. Or some kind of structure. Right. It's not quite a sequence. No, the easiest is the sequence. The structure would certainly be good enough, but the record here is they didn't even know. Nobody knew the structure. That's not, nobody suggested that. And how about the soil bacteria part of that analysis? Is it enough to say this comes from a particular set of closely related bacteria and the claim is limited to that? That was the other part of your proposal. Right, right, right, right, right. I mean, that's the question. That's one way to look at what the court needs to decide, in part. And we don't think it is because if you read this court's cases, the Carnegie Mellon and others, that it's not so much the size of the class. It's whether you've taught the public what it needs to know. And I think if you've just given one sequence, and even if it's a fairly tight other set, it's not enough. That's just what the law, that's what the law is because we want you to come up and if it was so easy, put it another way. If it was easy to do, they would have put the sequences in. They would have put more information. They wouldn't have just said soil. So the fact that it's not here, there's no articles telling you how to do it, unlike in some of the other cases. They haven't done enough to go beyond the one sequence. And that's the policing that the written description doctrine should be, Your Honor. I don't want to overstay my welcome, Your Honor. That's fine. Thank you. It's been a long day. Let me just have a few points. First of all, 2,4-D monooxygenase is not an enzymatic descriptor. That was described as that. It never was an enzymatic descriptor. It is not an enzymatic descriptor. It was a term of art having to do with the function of cleaving the side chain. Secondly, opposing counsel indicated that Dow's gene is not a TFDA gene. That's absolutely incorrect. It is a TFDA gene. It does exactly the step of cleaving the side chain and converting 2,4-D into 2,4-DCT. Then you're defining TFDA gene functional. That's correct, Your Honor. That's correct, Your Honor. And sometimes the patent refers to gene TFDA and sometimes it just refers to TFDA. And I think that distinction is important because the gene TFDA is the sequence that they found as the first step in the growth test. Figure 10, that sequence? That's gene TFDA. But when they talk about TFDA, they're talking about it more generically because it's just what performs the function of step A in the sequence. T, 2,4-D, step A. That's what it stands for. So, third point. Can I just ask a question on that matter of usage? Before 87, when you sequenced this, did the terminology TFDA refer to what people, or did people use it as referring to a particular molecule, a particular polypeptide, or to itself, to a functional class? That's an excellent question. It was referring to the function because nobody found the gene. Nobody knew what the molecule was. It was the function, that step A degradation function. When that term was used in the pre-sequence era, was it always referring to a particular polypeptide, a particular molecule, whether or not they knew the structure of it? It was referring generically to any protein and any gene that expressed the protein that created the cleavage of the side chains. In other words, it's an enzymatic activity, so that protein, that enzyme, they didn't know what it was. It wasn't characterized. They couldn't clone it. They couldn't sequence it. They just didn't know what it was. That escaped everybody. That was what was so clever about this invention and genius about the growth test was they found out how to do it and did it and then deposited that mutant bacteria that allowed anyone else to do it later. The third point I wanted to say is Judge Bum absolutely found that Dow's gene cleaves the side chain. Without a dispute, it is a TFDA gene. It cleaves the side chain. It performs the exact same function. That's why the claim construction is so important to us here. In fact, the Dow gene was found from one of these soil bacteria, one of the five that are listed in claim one of the patent. I think it was Pseudomonas or one of the other ones. The name changed of the bacteria also. It changed to Ralstonia eutrophis. I believe that was a new subcategory under Pseudomonas or perhaps one of the other ones. I'm not 100% sure of that off the top of my head. If you look at page 850, column 1, you'll see the five soil bacteria in general identified. There's also another thing that I wanted to point out. Do you want to wrap it up in a final thought? In the prosecution history, the Amy reference was cited. The Amy reference also called the function, cleaving the side chain, and called it 2,4-D-monooxygenase.  the intrinsic record. The Amy reference also called the function The last thing I'd like to say is the discussion about written description. Our case is far, far closer to ENSO where you have enough defined. What you need under AREAD, you need to define enough sufficient materials. You don't have to define only structures. It's not correct. As opposing counsel said, to claim a DNA, you have to have structure. No, you can have structure, but at least you have to have sufficient materials. That's where we say the growth test is sufficient materials along with the identification of the TFD18, along with the soil bacteria genre. It's far closer to ENSO or in vitrogen where you had, without specific multiple examples, you've got a class of H-minus reverse transcriptase that's identified and supported under written description. Thank you. We thank both counsel. We have your argument. The case is submitted.